UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

| | |
|---|---|
| **UNITED STATES**,<br><br>v.<br><br>**JUDGE ALSTON**,<br><br>Defendant. | No. 25-cr-249 (TSC) |

### MEMORANDUM OPINION

On August 12, 2025, seven U.S. Marshals partially surrounded Defendant Judge Alston's car over a minor parking violation. The Government concedes that before Alston gave any consent, a Marshal began illegally searching his car. Because that initial illegal search both tainted Alston's subsequent consent and rendered it involuntary, the court will GRANT Alston's Motion to Suppress Tangible Evidence, ECF No. 18.

### I.  BACKGROUND

On February 6, 2026, the court held an evidentiary hearing on Alston's Motion to Suppress. *See* Min. Entry (Feb. 6, 2026). It heard testimony from Alston and from Deputy U.S. Marshal David Lozada, a three-year veteran of the Marshals Service who participated in the search and seizure of Alston's car. *See* Hr'g Tr. (Rough Draft) at 2, 59. Lozada authenticated the body-worn camera footage of Senior Inspector John Dugan, Inspector Michael Longo, and Senior Inspector Edward Bruton. *See id.* at 9–11, 14, 19–20; *see also* Gov't Ex. 1 (Dugan Footage); Gov't Ex. 2 (Longo Footage); Gov't Ex. 3 (Bruton Footage). Lozada also authenticated his own body-worn camera footage, but his footage did not capture the most relevant moments of the stop because, as Lozada conceded, he did not activate his camera until well after he began searching Alston's car.

*See* Hr'g Tr. at 33–35; *see also* Def. Ex. 1 (Lozada Footage). The three other Marshals present at the scene did not activate their body-worn cameras at all. *See* Hr'g Tr. at 36–37. The witnesses' testimony and the body-worn camera footage establish the following:

On August 12, 2025, at around 9:30 p.m., Alston was sitting in the driver's seat of his car, which was double parked outside 3534 East Capitol Street NE in Washington, D.C. *See* Hr'g Tr. at 59–60. Alston's keys were in the ignition, but the engine was not running. *Id.* at 7, 60; *see also* Gov't Ex. 3 at 1:32:52–1:32:55.[1] Three unmarked police vehicles carrying a team of seven U.S. Marshals converged on Alston's car, blocking it from the front and rear. *See* Hr'g Tr. 5–8; *see also* Gov't Ex. 1 at 1:32:48–1:33:00. The Marshals were wearing tactical vests and carrying tasers and guns, though no weapons were drawn. Hr'g Tr. at 28. They were operating as part of the "federal takeover" of Washington, D.C., pursuant to the President's "Make D.C. Safe and Beautiful" Executive Order. *Id*. at 3–4, 25. Deputy Lozada described the "takeover" as a "high-visibility" "operation" involving a "large law enforcement presence" and traffic stops in "high-crime areas." *Id.* at 3–4.

After partially surrounding Alston's car, three Marshals, including Senior Inspectors Dugan and Bruton, approached Alston's window. *See* Gov't Ex. 1 at 1:32:55–1:33:00. Bruton informed Alston that he was parked illegally and asked what was going on. Alston replied that he was waiting for someone to come out of the building. *See* Gov't Ex. 3 at 1:33:03–1:33:10. Dugan then asked, "Why are you just sitting here like this?" Alston repeated that he was waiting for someone. Gov't Ex. 1 at 1:33:11–1:33:16. Dugan asked Alston for identification. When Alston produced a D.C. identification card, Dugan asked Alston if he had a driver's license, and Alston

---

[1] The time stamps on the body-worn camera footage reflect a time zone four hours ahead of Washington, D.C. *See* Hr'g Tr. at 11.

said he did not. Gov't Ex. 1 at 1:33:18–1:33:43. While Dugan questioned Alston, Deputy Lozada began shining his flashlight through the passenger side windows. *See id.*

After Alston said he did not have a driver's license, Dugan and Bruton walked to the rear of Alston's car to confer. Dugan said to Bruton, "We could get him for no permit. If you want to step him out and tell him, we'll search the car. You want to do that?" Gov't Ex. 3 at 1:33:40–1:33:56. Bruton replied, "Yeah." Gov't Ex. 1 at 1:33:56–1:33:59. Dugan then reapproached Alston and ordered him out of the vehicle. Gov't Ex. 1 at 1:34:00–1:34:02. As Alston opened the door to exit, Dugan noticed a baseball bat wedged between the driver's seat and door. Dugan jokingly exclaimed, "you got a baseball bat?!" Gov't Ex. 1 at 1:34:05–1:34:11. Dugan then briefly patted down Alston's waistband area, removed a small pocketknife clipped to Alston's front pant pocket, told Alston he would "throw the knife in the car real quick," and instructed Alston to "go talk" to Inspector Bruton at the back of the car. Gov't Ex. 1 at 1:34:10–1:34:19. Dugan then crouched into the driver seat area with his flashlight for a brief moment. *Id.*

Dugan also unlocked Alston's car, allowing Deputy Lozada to open the front passenger door and begin searching the front passenger area. Gov't Ex. 1 at 1:34:22–1:34:29. Specifically, as Lozada testified at the hearing, he went "into the car and then . . . start[ed] searching the front passenger's seat." Hr'g Tr. at 19. Lozada testified that he began searching because he believed he had "consent at that time;" he conceded, however, that no one had told him that Alston had consented to a search. *Id.* at 40. During his initial search, which lasted approximately twenty seconds, Lozada leaned into the car, grabbed a yellow bag from the front passenger seat floor, emptied the bag's contents onto the front passenger seat, and rummaged through Alston's private effects. *See* Gov't Ex. 1 at 1:34:28–1:34:32; Gov't Ex. 2 at 1:34:28–1:34:46; *see also* Hr'g Tr. at 21–23, 39–41; Def. Ex. 3 (showing Alston's personal items scattered across the front passenger

seat). Lozada did not open the center console or discover any weapons or contraband. *See* Hr'g Tr. at 22. Inspector Dugan saw Lozada begin this search but did not attempt to stop him. *See* Gov't Ex. 1 at 1:34:28–1:34:32.

Meanwhile, at the rear of the car, Inspector Bruton, flanked by other Marshals, began an extensive pat down of Alston's person. *See* Gov't Ex. 3 at 1:34:27–1:34:46. During this pat down, which did not reveal any contraband or weapons, Alston was facing towards the front of his car with his hands on the trunk and saw Lozada searching inside his car. *See id.*; *see also* Hr'g Tr. at 64. As Inspector Bruton searched Alston's person and Deputy Lozada searched Alston's car, Inspector Dugan said to Alston:

> All right, so here's the deal man. You can go [to jail] for not having a valid driver's license. You're sitting in the driver's seat of the car, you got the, got the uh key in the ignition. Alright? Is it cool if we just check and see if there's anything in the car?

Gov't Ex. 1 at 1:34:36–1:34:45. Alston replied, "Go ahead, sir." Gov't Ex. 1 at 1:34:45–1:34:47. Alston testified that when he said, "Go ahead," he "didn't think [he] had a choice because they was already in the car." Hr'g Tr. at 66. He further testified that he did not think he could stop the officers from continuing their search. *Id.*

At the same second Alston said, "Go ahead," Deputy Lozada withdrew his body from Alston's car. *See* Gov't Ex. 2 at 1:34:45–1:34:47. Lozada then stood outside the car for less than ten seconds. *See* Gov't Ex. 2 at 1:34:46–1:34:55. He testified that he "wanted to confirm that we had consent before I start[ed] searching again." Hr'g Tr. at 23. Once Lozada saw Dugan walking back towards the driver's seat, Lozada resumed his search. *Id.* Shortly thereafter, Lozada opened the center console and found a handgun. *See id.* Inspector Dugan then directed Alston to put his hands behind his back and another officer handcuffed him. *See* Gov't Ex. 1 at 1:35:16–1:35:34.

A grand jury subsequently indicted Alston for unlawful possession of a firearm by a person convicted of a felony in violation of 18 U.S.C. § 922(g)(1). *See* Indictment, ECF No. 12. Alston now moves to suppress the firearm, arguing that his consent was involuntary, and that, in any event, it was not an intervening act of free will sufficient to purge the taint of Deputy Lozada's unlawful search. *See* Def.'s Mot. to Suppress at 5–6, ECF No. 18. The Government appears to concede that Lozada's initial search violated the Fourth Amendment,[2] but contends that Alston's consent was voluntary and that the initial illegal search was not causally connected to the subsequent search which recovered the firearm. *See* Gov't's Opp'n at 9, 12, ECF No. 21.

## II.     LEGAL STANDARDS

The Fourth Amendment protects the "right of the people to be secure in their persons . . . against unreasonable searches and seizures." U.S. Const. amend. IV. "A search conducted without a warrant is 'per se unreasonable under the Fourth Amendment—subject only to a few specifically established and well-delineated exceptions.'" *United States v. Maynard*, 615 F.3d 544, 566 (D.C. Cir. 2010) (quoting *Katz v. United States*, 389 U.S. 347, 357 (1967)). One "exception to the warrant requirement" is consent by a person possessing authority over the area to be searched. *United States v. Glover*, 144 F.4th 336, 339 (D.C. Cir. 2025). Consent must be voluntary; if it is "coerced by threats or force, or granted only in submission to a claim of lawful authority," it is invalid. *Schneckloth v. Bustamonte*, 412 U.S. 218, 233 (1973). The voluntariness

---

[2] The Government "does not contest that Deputy Marshal Lozada conducted a search when . . . he leaned into the front passenger compartment." Gov't's Opp'n at 12, ECF No. 21; *see also United States v. Powell*, 483 F.3d 836, 838 (D.C. Cir. 2007) (recognizing that an officer conducts a search by leaning into a vehicle). And the Government makes no attempt to justify that initial search, as would be its burden. *See United States v. Jackson*, 415 F.3d 88, 92 (D.C. Cir. 2005) (explaining that it is the Government's burden to justify a warrantless search). The court therefore understands the Government to have conceded that Deputy Lozada conducted an illegal search of Alston's car before Alston consented.

inquiry is subjective: It "'turns not on whether a reasonable person in the defendant's position would have felt compelled to consent . . . , but, rather, on whether' the person who agreed to the search 'actually felt compelled to consent.'" *Glover*, 144 F.4th at 340 (quoting *United States v. Hall*, 969 F.2d 1102, 1106 (D.C. Cir. 1992)). Critically, when the Government contends that a defendant consented to a warrantless search, the Government bears the burden of proving that the consent was voluntary. *Schneckloth*, 412 U.S. at 222.

When "consent [is] given after an illegal search or seizure," the Government's burden is even greater. *United States v. Holmes*, 505 F.3d 1288, 1294 (D.C. Cir. 2007). It must show that the "consent is not merely voluntary but 'sufficiently an act of free will' that it was not a result of the exploitation of" the earlier unlawful search. *Id.* (quoting *Brown v. Illinois,* 422 U.S. 590, 599 (1975)); *see also United States v. Melendez-Garcia*, 28 F.3d 1046, 1053 (10th Cir. 1994) ("When a consensual search is preceded by a Fourth Amendment violation, . . . the government must prove not only the voluntariness of the consent . . . , but the government must also establish a break in the causal connection between the illegality and the evidence thereby obtained." (cleaned up)). This fruit-of-the-poisonous-tree analysis comes from *Wong Sun v. United States*, which held that evidence must not have "been come at by exploitation of [the initial] illegality [but] instead by a means sufficiently distinguishable to be purged of the primary taint." 371 U.S. 471, 488 (1963). This test "extends to invalidate consents which *are* voluntary" because there will be cases where the "pressure upon the person . . . is not so great that 'his will has been overborne' under the *Schneckloth* voluntariness rule, but yet it cannot be said under *Wong Sun* that his consent was 'sufficiently an act of free will to purge the primary taint.'" Wayne R. LaFave, Search and Seizure § 8.2(d) (6th ed. 2025) (emphasis in original).

Although the fruits analysis imposes a distinct burden on the Government, on the facts of this case, it shares significant analytical overlap with the voluntariness test. *See Melendez-Garcia*, 28 F.3d at 1054 (explaining that "the two requirements will often overlap to a considerable degree," in part because "an illegal search or seizure . . . may affect the voluntariness of the defendant's consent"); *see also* LaFave, *Search and Seizure* § 8.2(d) ("[T]here is sufficient overlap of the voluntariness and fruits tests that often a proper result may be reached by using either one independently[.]"). Consent given "'only in submission to an officer's claim of lawful authority' to carry out the search" is involuntary under *Schneckloth*. *Glover*, 144 F.4th at 340 (quoting *Schneckloth*, 412 U.S. at 233). And when consent immediately follows an illegal search, it may amount to "nothing more than 'submission or resignation to police authority'" if the illegal search "'erroneously'" convinced the suspect that police already had authority to search and thus "'it was useless to resist.'" LaFave, Search and Seizure § 8.2(d) (quoting *People v. Clark Mem'l Home*, 252 N.E.2d 546, 549 (Ill. App. Ct. 1969)); *see also State v. Gorup*, 782 N.W.2d 16, 28 (Neb. 2010) (quoting *State v. Cates*, 522 A.2d 788, 792 (Conn. 1987) ("Consent to search given in very close temporal proximity to the official illegality is often a mere submission or resignation to police authority and not necessarily an act of free will.")). By the same logic, when an illegal police search leads a suspect to consent under the false impression that police can proceed with or without his agreement, the suspect's consent is not only involuntary but also a fruit of the initial illegal search. *See* LaFave, Search and Seizure § 8.2(d) ("[A] consent to search which fails the voluntariness test because of a prior illegality may just as convincingly be said to be a fruit of the prior illegality[.]").

### III.   DISCUSSION

Here, the voluntariness inquiry and the fruits-of-the-poisonous-tree inquiry independently lead to the same conclusion: Alston's consent constituted mere surrender to an implied claim of

police authority and thus cannot justify the warrantless search of his car. The search of Alston's car therefore violated the Fourth Amendment, and the resulting firearm must be suppressed. *See United States v. Green*, 149 F.4th 733, 743 (D.C. Cir. 2025) ("[T]he remedy [for a Fourth Amendment violation] is generally exclusion—courts must suppress the unlawfully obtained evidence and any derivative evidence tainted by the violation unless an exception [to the exclusionary rule] applies.").

A. **Voluntariness**

It is well established that consent given "only in submission to an officer's claim of lawful authority" is involuntary. *Glover*, 144 F.4th at 340 (quoting *Schneckloth*, 412 U.S. at 233). That is because "[w]hen a law enforcement officer claims authority to search," "he announces in effect that the [suspect] has no right to resist," rendering the "situation . . . instinct with coercion." *Bumper v. North Carolina*, 391 U.S. 543, 550 (1968). Although this doctrine is most clearly applicable "where a person agrees to a search after officers misrepresent that they have a search warrant," *Glover*, 144 F.4th at 341, the officer's assertion of authority need not be so explicit. The Supreme Court has said that consent must "not be coerced, by explicit *or implicit means*." *Schneckloth*, 412 U.S. at 228 (emphasis added). The D.C. Circuit has also endorsed the proposition that "consent is ineffective if it follows an express *or implied* claim by the police that they can immediately proceed to make the search." *Glover*, 144 F.4th at 341 (emphasis added) (quoting *Orhorhaghe v. INS*, 38 F.3d 488, 501 (9th Cir. 1994)). The Circuit has further indicated that an "ambiguous" claim of lawful authority can "vitiate[] voluntary consent." *Id.*

Alston testified that he "didn't think [he] had a choice" when the Marshals asked for his consent "because they was already in the car." Hr'g Tr. at 66. He further testified that he did not think the Marshals would stop searching his car if he withheld consent. *See id.* Based on Alston's

demeanor as a witness and the circumstances of the August 12 seizure, the court finds his testimony credible. As courts have repeatedly recognized, "[a] suspect's knowledge of a prior illegal search can give rise to a sense that refusing to consent would be futile." *United States v. Washington*, 387 F.3d 1060, 1074 (9th Cir. 2004); *see also United States v. Haynes*, 301 F.3d 669, 683 (6th Cir. 2002) (same). That is so in part because "police activity in searching place A may fairly be said to be a manifestation of authority to search place A," and thus withholding consent would be pointless. LaFave, *Search and Seizure* § 8.2(d); *see also State v. Garcia*, 461 N.W.2d 460, 465 (Iowa 1990) (reasoning that an illegal search of defendant's car did not invalidate defendant's subsequent consent to search his motel room in part because "the officers had exercised no control over defendant's motel room" and therefore "defendant had no reason to believe the search would be conducted with or without his consent").

Apply those principles to the facts of this case: Alston watched Deputy Lozada search his car before Alston had given any consent. By searching Alston's car without first asking for his permission, Lozada implied to Alston that his consent was unnecessary—he "ha[d] no right to resist the search" that the Marshals had already begun. *Bumper*, 391 U.S. at 550; *see also Washington*, 387 F.3d at 1074. In other words, the earlier search gave Alston "reason to believe the search would be conducted with or without his consent." *Garcia*, 461 N.W.3d at 465. Accordingly, he understandably interpreted Dugan's subsequent question—"is it cool" if we do what we are already doing?—not as a meaningful request for permission but as an empty gesture that involved no real choice. His consent, then, was nothing more than mere submission to implied police authority. *See Gorup*, 782 N.W.2d at 28 ("Consent to search given in very close temporal proximity to the official illegality is often a mere submission or resignation to police authority[.]" (cleaned up)).

Notably, none of the officers informed Alston of his right to withhold consent. Although "the police are not *required* to give such a warning before conducting a consensual search, the failure to give such a warning *is* one of the factors relevant to the voluntariness inquiry." *Hall*, 969 F.2d at 1108 n.7 (emphasis in original); *see also United States v. Sparks*, 594 F. Supp. 3d 9, 22 (D.D.C. 2022) ("Such a warning is not necessary for voluntary consent, but the lack of one is a relevant factor to be considered in the totality of the circumstances."). Here, the Marshals falsely implied to Alston that his consent was not necessary by searching his car without it. By failing to explicitly warn Alston that he could in fact withhold consent, the Marshals did nothing to dispel the false impression that their illegal conduct had created or to inform him of his right to stop the police by saying no. *See* LaFave, Search & Seizure § 8.2(d) (suggesting that "the illegality of the first search will not *necessarily* invalidate the consent" subsequently given "by one *who knows* that the police do not claim any authority to continue the search without consent" (emphasis added)).

The Government emphasizes several factors which would, in a case involving no implied assertion of lawful authority, support a finding of voluntary consent: Alston was 56 years old, had a high school education, and had prior experience with the criminal justice system; the Marshals did not use force or subject Alston to repeated and prolonged questioning; and the Marshals otherwise maintained a cordial, conversational tone of voice. *See* Gov't Opp'n at 9–12; *see also United States v. Robinson*, 698 F.2d 448, 455 (D.C. Cir. 1983) (holding that a statement was "clearly voluntary" where the defendant "was 30 years old, possessed an eleventh-grade education, and had been convicted twice before of serious felonies" and where law enforcement made "no threats" and used no force).

But Deputy Lozada's initial illegal search significantly changes the calculus because it put Alston under the false impression that he had no right to resist the search. *See Bumper*, 391 U.S. at 548–49 (The Government's burden of establishing voluntary consent "cannot be discharged by showing no more than acquiescence to a claim of lawful authority."). Moreover, as explained in more detail below, *see infra* Part III.B.2, Alston otherwise "faced a coercive situation at the time he gave consent." *Holmes*, 505 F.3d at 1295. Among other things, there was a heavy police presence, Inspector Dugan implicitly threatened Alston with arrest for driving without a license if he did not consent, Inspector Bruton was actively engaged in an invasive pat-down search of Alston's person when Dugan sought consent, and Alston had already seen Lozada searching his car when Dugan asked for his consent. These factors reinforced Alston's perception that he had no meaningful ability to stop what the police were already doing. Alston's consent was therefore mere acquiescence to an implied claim of police authority and cannot justify the warrantless search of his car. The gun must be suppressed on this basis alone.

## B. Fruit of the Poisonous Tree

The fruit-of-the-poisonous-tree doctrine independently requires suppression. That is because the discovery of the gun in Alston's center console is a fruit of Deputy Lozada's initial illegal search and the Government has failed to show that Alston's consent was an act "sufficient to 'purge the primary taint' and break the causal chain between the illegal [search] and the [gun's] ultimate discovery." *Holmes*, 505 F.3d at 1294 (quoting *Brown*, 422 U.S. at 602). Indeed, because Alston's consent "flowed directly from the [illegal search], it is hard to spot any attenuation" at all. *United States v. Brodie*, 742 F.3d 1058, 1063 (D.C. Cir. 2014).

1. *Prima Facie* Showing of Causal Connection

The Government first contends that Alston has failed to show a causal connection between Deputy Lozada's initial illegal search and the subsequent discovery of the firearm. Gov't Opp'n at 12–13. Although the Government is correct that a "defendant must make a *prima facie* showing of a causal nexus between the Fourth Amendment violation and the evidence he seeks to suppress," *Holmes*, 505 F.3d at 1292, Alston has amply made that showing.

To start, Deputy Lozada had just searched the very place that Inspector Dugan requested permission to search. When "the illegal action and the subsequent consent search are of the same location, . . . the likelihood is greater that illegal action influenced the consent, and therefore the causal connection is stronger." *United States v. Robeles-Ortega*, 348 F.3d 679, 684 (7th Cir. 2003). That is so here. Alston credibly testified that he did not think he could stop the Marshals from searching his car "because they was already in the car." Hr'g Tr. at 66. Alston has therefore made a *prima facie* showing that Lozada's initial illegal search caused his consent, and that his consent caused the subsequent discovery of the firearm.

The Government stresses that Lozada's initial illegal search did not uncover any evidence, describing the initial illegal search as "merely an investigative detour that led to a dead end." Gov't Opp'n at 13. To be sure, if Deputy Lozada's initial search had uncovered contraband, the causal connection between that search and a subsequent search would be stronger. That is because when a suspect is confronted with contraband obtained in a search he has just watched unfold, the suspect would believe that he has been "caught red-handed," "the jig was up," and there was "no real choice" but to consent. *United States v. Collins*, 510 F.3d 697, 701 (7th Cir. 2007). But it does not follow that Deputy Lozada's initial lack of success somehow severs the connection between his initial search, Alston's consent, and the subsequent search. *See Gorup*, 782 N.W.2d at 30

("Relying on cases in which the suspects observed officers seize contraband or learned of the discovery from the officers does not show that the taint of the illegal action is purged unless those facts are present."). "[E]ven if [an initial illegal search] did not produce incriminating evidence," it "may have been sufficiently similar and recent as to make a later consent involuntary because the earlier experience causes the consenter to conclude that refusal to consent on the present occasion would be pointless." LaFave, Search and Seizure § 8.2(d); *see also United States v. Simpson*, 439 F.3d 490, 495 n.3 (8th Cir. 2006) ("[I]n cases where, for example, the defendant consents to a search, the time between the initial illegality and the defendant's consent is critical because the closer this period, the more likely the defendant's consent was influenced by, or the product of, the police misconduct. Evidence recovered under these circumstances is ordinarily considered tainted and therefore inadmissible."). That is so here. Because Alston had just witnessed Deputy Lozada search his car, he was justified in his belief that he could not stop the officers from searching further by withholding consent. His consent was therefore a product of the initial illegal search and provides a causal link between the initial illegal search and the subsequent search that uncovered the gun.

  2. *Brown* Factors

With a *prima facie* causal connection established, the burden shifts to the Government to prove by a preponderance of the evidence that the discovery of the gun "was so attenuated from the illegal search" that "the taint" of the initial illegality had "dissipated." *Holmes*, 505 F.3d at 1293. In assessing whether consent given after an illegal search "is a sufficiently free act to purge the taint" of an initial illegal search, the court considers the four factors from *Brown v. Illinois*: "(1) whether *Miranda* warnings were given; (2) the temporal proximity of the [initial illegal search] and consent; (3) the presence of intervening circumstances; and (4) the purpose and

flagrancy of the official misconduct." *Id.* at 1294 (citing *Brown*, 422 U.S. at 603–04). These factors are "non-exclusive" and "no single fact is dispositive." *Id.* (cleaned up).

Beginning with "the issue of temporal proximity," "there was virtually no temporal gap between the [illegal search] and the consent." *Holmes*, 505 F.3d at 1295; *see also Brodie*, 742 F.3d at 1063 ("The evidence was discovered mere seconds after the illegal seizure, so time obviously did not purge the taint."). Deputy Lozada was actively searching Alston's car when Inspector Dugan asked Alston if it was "cool" to search it, and Lozada withdrew from the passenger compartment at the same time Alston said, "Go ahead." To the extent this can even be characterized as a break in time, "[i]t is difficult to imagine a shorter time frame between the unconstitutional action and consent." *Robeles-Ortega*, 348 F.3d at 683. This factor therefore "weighs heavily against a finding" that Alston's consent "purge[d] the taint of the earlier illegal police conduct." *Holmes*, 505 F.3d at 1295. Notably, the D.C. Circuit in *Holmes* cited cases which found 15- and 45-minute time lapses insufficient. *See id.* (citing *United States v. Washington*, 387 F.3d 1060, 1073 (9th Cir. 2004) and *United States v. Maez*, 872 F.2d 1444, 1456 (10th Cir. 1989)).

"Further, any 'intervening circumstances' are of little help to the government." *Holmes*, 505 F.3d at 1295. After stopping Alston, the agents ordered him out of the vehicle, started searching his car, and frisked him twice.[3] Indeed, Deputy Lozada was actively searching Alston's car and Inspector Bruton was actively searching Alston's person as Inspector Dugan asked for consent. Moreover, immediately before asking Alston whether it was "cool" if the Marshals

---

[3] The parties debate whether the frisks were justified, but the court need not decide that issue. Even assuming the frisks were lawful, they still contributed to a police-dominated atmosphere where the coercive pressures on Alston were significant. *See United States v. Robertson*, 736 F.3d 677, 680 (4th Cir. 2013) (explaining that a "police-dominated atmosphere" weighs against a finding of voluntary consent to a search); *see also Sherrod v. McHugh*, 334 F. Supp. 3d 219, 246 (D.D.C. 2018) ("Courts in this jurisdiction have held that a show of force by the police may render consent involuntary[.]").

searched his car, Dugan informed Alston that he could be arrested for driving without a license. Because the timing of Dugan's statements reasonably implied to Alston that his best hope of "avoiding arrest that night was to consent to the search" that had already begun, Alston "faced a coercive situation at the time he gave consent." *Holmes*, 505 F.3d at 1295. There is no indication, moreover, that Alston had any time "to pause and reflect" before he gave consent, *United States v. Brandwein*, 796 F.3d 980, 986 (8th Cir. 2015) (citation omitted), much less an opportunity to consult a family member or a lawyer, *see United States v. Conrad*, 673 F.3d 728, 733 (7th Cir. 2012).

The Government argues that, despite the striking similarities between this case and *Holmes*, there are several differences which make the circumstances less coercive. *See* Gov't Opp'n at 13–16. In *Holmes*, the officers had chased the suspect after he fled, handcuffed him, and questioned him about where he had come from and how he had gotten there, all this occurring "in the middle of the night on an empty street." 505 F.3d at 1295. Alston, by contrast, was never chased or handcuffed, was not similarly questioned, and the traffic stop occurred around 9:30 p.m., not 3:40 a.m.—though notably, Alston was stopped on a quiet side street that the Marshals had blocked off to other traffic.

On the other hand, there are also several factors present in this case and absent in *Holmes* which cut against the Government. First, in *Holmes*, the officers "informed [the suspect] of his right to refuse consent" by reading him a consent form that they then had him sign. 505 F.3d at 1294. Here, none of the officers advised Alston of his right to refuse consent, much less had him sign a consent form. Nor did they read Alston his *Miranda* rights. Although the Government may be right that Inspector Dugan was not required to read Alston his *Miranda* rights at the time, Gov't Opp'n at 14–15, the absence of *Miranda* and other warnings is still relevant to determining whether

there was an intervening event that helped dispel the false impression of lawful authority that Alston was under. *See Hall*, 969 F.2d at 1108 n.7; *see also United States v. Robertson*, 736 F.3d 677, 680 (4th Cir. 2013) ("Whether the individual searched was informed of his right to decline the search is a highly relevant factor" in assessing voluntariness. (cleaned up)).

Second, the seizure in *Holmes* involved only two police officers. *See* 505 F.3d at 1290. Here, by contrast, the seizure involved three police vehicles and seven federal agents in tactical gear—a far heavier police presence than normal for a routine traffic stop. *See Berkemer v. McCarty*, 468 U.S. 420, 438–39 (1984) (explaining that the "ordinary traffic stop" is not a heavily "police dominated" atmosphere, in part because "the detained motorist typically is confronted by only one or at most two policemen"); *see also Robertson*, 736 F.3d at 680 (concluding that the presence of "three patrol cars and five uniformed officers" rendered the area "dominated by police officers" and weighed against a finding that consent was voluntary). Indeed, as Deputy Lozada himself testified, his deployment that evening as part of a "high-visibility," "large law enforcement presence" was designed to project an imposing show of force in "high-crime areas." Hr'g Tr. at 3–4, 25–26. "Courts in this jurisdiction have held that a show of force by the police" can weigh against a finding that consent is voluntary. *Sherrod v. McHugh*, 334 F. Supp. 3d 219, 246 (D.D.C. 2018).

Finally, "while the police conduct may not have been especially flagrant, neither was it a case of an innocent mistake." *Brodie*, 742 F.3d at 1063. Although Lozada testified that he believed Alston had consented, Lozada neither heard Alston consent nor was told by anyone on the scene that Alston had consented. Hr'g Tr. at 18, 40. It is not reasonable to invade a constitutionally protected space without a meaningful indication of permission or probable cause. Moreover, Dugan's earlier statement to Bruton—that they should "step [Alston] out and tell him, we'll search

the car"—further suggests that obtaining Alston's consent was, at best, an afterthought. Even setting aside these problematic facts and assuming there was a "lack of flagrant police misconduct," the "absence of that factor" would not "compensate[] for the strongly coercive circumstances otherwise surrounding [Alston's] grant of consent to search." *Holmes*, 505 F.3d at 1295.

In short, Alston's consent to a search that had already begun—consent that was given under highly coercive circumstances and under the false impression that police had the authority to search—was not "an intervening act of free will that broke the causal link" between the initial illegal search and the subsequent discovery of the gun. *Id.* The gun is therefore a fruit of Deputy Lozada's initial illegal search and must be suppressed on this independent basis as well.

## IV.   CONCLUSION

For the foregoing reasons, the court will GRANT Alston's Motion to Suppress Tangible Evidence. A separate order will issue.

Date: March 5, 2026

*Tanya S. Chutkan*
TANYA S. CHUTKAN
United States District Judge